**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **HERMAN E. PURNELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Civil Action No.: 2:13-CV-01954-RDP** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Acting Commissioner of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Herman Purnell brings this action pursuant to Title II of Section 205(g) and Title XVI of Section 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Administrative Law Judge ("ALJ"), denying his claims for disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI").  *See* 42 U.S.C. §§ 405(g) and 1383(c).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I.      Proceedings Below

This action arises from Plaintiff's application filed on August 31, 2009 for SSI under Title XVI, as well as an application filed on September 3, 2009, for disability and DIB under Title II.  (Tr. 72-73, 127-32, 133-36).   Both applications alleged disability beginning on December 31, 2005.  (Tr. 129, 133).  His claims were denied on September 15, 2010.  (Tr. 78, 83).  Plaintiff subsequently requested a hearing on November 15, 2010.  (Tr. 90-92).  A hearing was held on April 20, 2012, via video conference in St. Louis, Missouri. (Tr. 36-68).  Plaintiff

appeared in Birmingham, Alabama with his attorney. (Tr. 36).  Also present at the hearing was a Vocation Expert ("VE"). (*Id.*).

On May 30, 2012, the ALJ issued a decision, finding Plaintiff had not been under a disability as defined by the Act since his alleged onset date of December 31, 2005. (Tr. 20-30). After the ALJ rendered his decision, Plaintiff requested review by the Appeals Council. (Tr. 14-16).  The Appeals Council denied Plaintiff's request and the ALJ's decision became the final decision of the Commissioner; therefore, a proper subject of this court's appellate review. (Tr. 1-3).

At the time of the hearing, Plaintiff was forty-four years old with a tenth[1] grade education, but cannot read or write. (Tr. 41-42, 48, 63).  Notably, Plaintiff's intellectual quotient ("IQ") ranges from 72-78, and he was in special education classes while in school. (Tr. 185-90). Plaintiff previously worked as an assembler, grounds keeper, laborer, delivery helper, and maintenance helper. (Tr. 62-63, 165, 212).   Plaintiff alleges he is unable to work due to limitations caused by a leg injury, high blood pressure, and pain when standing. (Tr. 161). Plaintiff also has dyslipidemia, glucose intolerance, chronic kidney disease secondary to high blood pressure, congestive heart failure, concentric hypertrophy (enlarged heart), erectile dysfunction, chronic pain, and degenerative arthritis in his knee. (Tr. 341, 350, 356, 372, 385, 388).  The record shows that Plaintiff was involved in a motor vehicle crash in the past and underwent a surgical intervention leaving him with "plates in his spine."[2] (Tr. 372, 438).

---

[1] Because Plaintiff was "put out" of school during his tenth grade year, thereby not completing that grade, the ALJ considered that Plaintiff has a ninth grade education and included that data point during questioning of the VE.  (Tr. 42, 63).

[2] Plaintiff's Function Report notes that Plaintiff "fell fighting someone and broke my hand[;] it has a medal [*sic*] plate." (Tr. 175). During the hearing, the ALJ asked Plaintiff if he had a problem with his hand in the past. Plaintiff responded, "Yes, sir.  I have a steel plate right here."  (Tr. 61).

Plaintiff's function report, filled out by Yteria Tolbert, a friend of Plaintiff's for twenty years, states that Plaintiff's conditions causes him problems with lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs. (Tr. 173).  He has difficulty with his memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 170-73).  He is capable of making himself sandwiches, but does not prepare meals anymore because he forgets he is cooking and burns the food, he does not finish projects that he starts because he "forget[s] where [he is] on written instruction," and indicates that he "don't like to be told what to do so [he] don't take instruction good." (*Id.*).  He can cut the yard in two days, do laundry, and go outside to sit and to feed the dog, drive, shop for his clothes, watch TV, and garden. (*Id.*).  Plaintiff's report also states he attends church when "my sister get[s] me up," can walk approximately two blocks without needing to rest, and is able to pay bills and count change.  (*Id.*).

Along with Plaintiff's own Function Report, an Adult Third Party Functional Report was submitted by Ms. Tolbert, on Plaintiff's behalf. (Tr. 201-08).  Ms. Tolbert reported that: Plaintiff sleeps during the day, not at night; does not dress or bathe the way he has in the past; and does not eat often. (Tr. 202).  Ms. Tolbert further reported Plaintiff can prepare frozen dinners, make his bed, and rinse the bathtub out. (Tr. 203).  Contrary to Plaintiff's Function Report, Ms. Tolbert reported Plaintiff is unable to pay bills, count change, handle a savings account, or use a checkbook or money orders. (Tr. 204).  Ms. Tolbert also reported that Plaintiff needs someone to accompany him to the doctor because "he does not thin[k] anything is wrong with him." (Tr. 205).  Additionally, Ms. Tolbert reported that Plaintiff's back hurts him, and walking or sitting too long also hurts him. (Tr. 206).  Additionally, in further contrast to Plaintiff's Function

Report, Ms. Tolbert reported Plaintiff is able to walk only a half block before needing to stop for rest. (*Id.*).

In August 2010, Plaintiff was examined by Dr. Hirenhumar Jani, a consultative examiner for the Social Security Administration. (Tr. 258-62).  The examination record shows that Plaintiff complained of pain in his chest, neck, left leg, and right hand. (Tr. 259).  On a scale of zero to ten, Plaintiff described the pain in his chest as a three, his neck an eight, his left leg a ten, and his right hand an eight. (Tr. 259-60).  Dr. Jani noted that Plaintiff could drive, do limited housework chores like cooking and making his bed, wash dishes, vacuum, and do yard work. (Tr. 260).  Plaintiff denied smoking, alcohol, or substance abuse. (*Id.*).  Dr. Jani also noted Plaintiff had "several epidural injections and also underwent therapy for two weeks without any improvement." (Tr. 259).  Plaintiff's examination was unremarkable except for his present complaints of pain. (Tr. 260).  Based on Plaintiff's school record and psychological evaluation, Dr. Jani noted Plaintiff fell into the "slow learner of intellectual-function category." (Tr. 259). After examining Plaintiff and reviewing his records, Dr. Jani made the following functional assessment and medical source statement:

> As far as walking and standing, [Plaintiff] can walk and stand at least six hours without any restrictions.  No restrictions while sitting.  He does not need any assistive device.  He can lift and carry 100 pounds occasionally and 50 pounds frequently without any restrictions.  Postural[l]y and manipulatively, there are no restrictions.  Environmentally, he needs to be in an adaptive environment for a slow learner.

(Tr. 262).

Later in August 2010, Plaintiff was seen by Dr. John Neville, a licensed psychologist, at the request of the Social Security Administration. (Tr. 263-66).  Dr. Neville noted that Plaintiff indicated his back and legs hurt, he was not sleeping well, and that he had lost twenty pounds in

4

the last year. (Tr. 263).  Dr. Neville further noted Plaintiff was easily fatigued and had poor energy and motivation. (*Id.*).  Additionally, Plaintiff had indicated he was suicidal, and said that he "feels tense all the time," and has a bad temper. (*Id.*).  Additionally, Dr. Neville noted Plaintiff said that he gets physically aggressive at times, and "sees snakes all the time." (*Id.*).  When examining Plaintiff's mental status, Dr. Neville found Plaintiff did not appear depressed or psychotic, was not anxious or restless, and that he was alert and well-oriented. (Tr. 265).  After being asked several addition, subtraction, multiplication and division questions, Plaintiff answered only the addition questions correctly.  (*Id.*).  Plaintiff's judgment and insight were noted to be poor, and his intellectual functioning was in the borderline to mildly retarded range. (*Id.*).

Dr. Neville's diagnostic impression showed Plaintiff had a mild, single episode of Major Depressive Disorder, and borderline intellectual functioning. (Tr. 266).  Both psychiatric treatment and psychotherapy were recommended for Plaintiff, with Dr. Neville noting Plaintiff's prognosis "fair to good" if treatment was received.  (*Id.*).  After the examination and review of the medical evidence of record, Dr. Neville found Plaintiff was cognitively able to manage his finances, as well as cognitively and emotionally capable of functioning independently.  (*Id.*).  Plaintiff's short term memory was noted to be moderately to severely impaired, and his ability to carry out instructions also mildly to moderately impaired. (*Id.*). Dr. Neville further noted Plaintiff's ability to cope with ordinary work pressures was moderately impaired, but he seemed willing to accept supervision. (*Id.*).

In September 2010, Dr. Robert Estock, a non-examining medical consultant, reviewed Plaintiff's records upon request by the Social Security Administration, and completed a psychiatric review technique and a residual functional capability ("RFC") assessment. (Tr. 272-

89).  Dr. Estock noted Plaintiff had depression and borderline intellectual functioning. (Tr. 275-76).  Dr. Estock further noted Plaintiff had moderate limitations in the following: activities of daily living; social functioning; and concentration, persistence, or pace.  (Tr. 282).  However, he found Plaintiff had no episodes of decompensation for an extended duration. (*Id.*).  In his mental RFC assessment, Dr. Estock noted Plaintiff was able to understand and remember simple, not detailed, tasks. (Tr. 288).  Dr. Estock further noted that Plaintiff may miss a day of routine duties due to his psychological impairment, but that he was able to complete simple one to two step tasks for at least two hours, and thus was able to complete an eight hour work day without excessive breaks or frequent supervision. (*Id.*).  Dr. Estock's RFC assessment found Plaintiff was capable of interacting with co-workers and the public in a casual setting and could accept non-threatening supervision. (*Id.*).  Dr. Estock ended his assessment by noting Plaintiff's work demands should be mostly routine, with change being infrequent and, in any event, gradually introduced. (*Id.*).

During Plaintiff's alleged period of disability, he received treatment from various healthcare providers.  In December 2010, Plaintiff was referred to the Heart South Cardiovascular Group ("Heart South") by his primary care physician, Dr. Howard.  At his initial visit, Plaintiff complained of chest pain and shortness of breath. (Tr. 345).  Plaintiff also admitted "ongoing tobacco and [marijuana] usage," and had a family history of heart disease. (Tr. 345).  The physician advised Plaintiff to undergo a cardiac catheterization to evaluate his heart health. (Tr. 348).  In January 2011, Plaintiff underwent a heart catheterization with selective left and right coronary angiography. (Tr. 340).  The results of that procedure were negative, except for "very mild" atherosclerotic plaquing and mild peripheral arterial disease. (Tr. 341).  The records show that at the follow-up appointment with Heart South, Plaintiff had no

complaints except erectile dysfunction. (Tr. 350).   Six months later, at another follow-up, Plaintiff stated his chest pain had resolved, but that he had muscle weakness due to his cholesterol medication, numbness, ringing in his ears, and arthritis. (Tr. 422).   The record shows Plaintiff reported being in no pain during the visit. (Tr. 423).   At Plaintiff's last visit to Heart South in January 2012, he complained of night sweats, back pain, and "falling down." (Tr. 429). The remainder of Plaintiff's assessment was negative for any abnormalities. (*Id.*).

Plaintiff's visits to his primary care physician, Dr. Howard, are numerous.  The week of Plaintiff's heart catheterization in January 2011, Plaintiff was seen by Dr. Howard for complaints of pain in his left leg and knee that had become so severe he was having difficulty walking.  (Tr. 357).   Dr. Howard suspected the pain was caused by arthritis and an x-ray was performed, the results of which showed significant degenerative arthritis. (Tr. 356-57).   Plaintiff's examination showed he was attentive, with a stable mood and outlook. (Tr. 357).   In April 2011, Plaintiff saw Dr. Howard again, complaining of left knee pain; an MRI was ordered and results showed "mild tendinosis." (Tr. 388, 401).   On the same visit, other than complaints of back, neck and knee pain, Plaintiff's examination was normal. (Tr. 388-89).   Dr. Howard further noted that Plaintiff had no sleeping problems, no sensory deficits, his mood and outlook was stable, and he was attentive. (*Id.*).

On April 28, 2011, Plaintiff visited the Emergency Room at Baptist Shelby Medical Center ("Baptist Shelby") complaining of chest pressure and radiating pain in his left arm.  After a few hours his pain had subsided. (Tr. 406-21).  Plaintiff was discharged after his EKG and lab tests were completed and he was ordered to follow-up with his primary care physician, Dr. Howard. (Tr. 409).  A few days later, Plaintiff visited Dr. Howard for an evaluation, complaining that he had pain when he raised or rotated his left arm. (Tr. 385).  Dr. Howard noted Plaintiff's

pain to be consistent with "chest wall syndrome," and ordered a Medrol Dosepak and Mobic. (Tr. 385).  Dr. Howard further noted that Plaintiff showed no focal musculoskeletal deficits, and that his muscles appeared normal and symmetric. (Tr. 385-86).

On June 13, 2011, Plaintiff saw Dr. Howard, and requested Lortab to manage his back pain until his pain management appointment on June 21, 2011.[3] (Tr. 382).  Dr. Howard noted he had prescribed Plaintiff Indocin and Lortab in the past for his chronic pain. (*Id*.).  Dr. Howard prescribed Plaintiff twenty (20) Lortab tablets for his severe back pain, and ordered Plaintiff to hold his cholesterol medication for two weeks.[4]  The following month, Plaintiff was evaluated by Dr. Howard for "significant cervical pain and pain down his arm." (Tr. 379).  Dr. Howard noted that Plaintiff experienced a lot of leg pain and paresthesias, and ordered a nerve conduction study[5] as the symptoms were consistent with lower motor tract involvement. (*Id*.).  Dr. Howard further noted that Plaintiff's blood pressure was well controlled, and that his muscles appeared normal and symmetric. (Tr. 379-80).

On August 30, 2011, Plaintiff saw Dr. Howard for evaluation of cellulitis and possible perirectal abscess.  (Tr. 376).  At this visit, Dr. Howard noted that Plaintiff "feels a lot better," that he had no pain in his muscles, extremities, or his chest, and that he was attentive with a stable mood and outlook. (*Id*.).  Also on this date, Dr. Howard completed a Physical Capacities Evaluation of Plaintiff.  Specifically, Dr. Howard opined Plaintiff would only be capable of lifting five pounds occasionally, sit for two hours and stand for one hour in an eight-hour day, would require a cane when active, and be unable to operate motor vehicles. (Tr. 369).  Dr.

---

[3] There are no records from Plaintiff's pain management appointment.

[4] Dr. Howard noted he was holding Plaintiff's cholesterol medication to see if the medication was the cause of Plaintiff's muscle pain and myalgias.  (Tr. 382).

[5] The results of this test are not included in the record.

Howard further noted Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work, and that physical activity, prolonged sitting or standing, would increase Plaintiff's pain to an extent that bed rest or medication is necessary. (Tr. 370).  Dr. Howard opined the side effects of prescribed medication would leave Plaintiff totally restricted and unable to function at a productive level of work. (Tr. 371).

The next month, however, Plaintiff was seen by Dr. Howard for severe myalgias and muscle pain. (Tr. 374).  Dr. Howard noted Plaintiff had "improved somewhat," and that he would change Plaintiff's cholesterol medication because Plaintiff's lab results had been elevated previously from taking another medication. (Tr. 440).  Plaintiff's examination showed his muscles appeared normal and symmetric, and that his extremities had no pain or swelling.  (Tr. 374).

In October 2011, Plaintiff was evaluated again by Dr. Howard for chronic cervical pain. (Tr. 372).  Dr. Howard continued Plaintiff's Lortab and noted he would refer Plaintiff to Dr. Durham.[6] (Tr. 438).  Later in the same month, Plaintiff returned to Dr. Howard with chronic cervical pain, and was prescribed forty (40) Lortab tablets for pain management until his appointment with Dr. Durham on November 7, 2011. (Tr. 436).  In late January 2012, Plaintiff was seen by Dr. Howard with complaints of neck and back pain, and fatigue. (Tr. 433).  Dr. Howard noted that Plaintiff had no chest or extremity pain, and that his muscles appeared normal and symmetrical. (*Id*.).

---

[6] There are no medical records from Dr. Durham.  The only references to Plaintiff's visits to Dr. Durham are found in the medical records from Dr. Howard's January 2012 evaluation of Plaintiff and in the hearing transcript.  (Tr. 55, 433).  Dr. Howard noted that Plaintiff was on Hydrocodone at Dr. Durham's direction for ongoing back and neck pain.  (Tr. 433).  During the hearing, when the ALJ questioned Plaintiff about Dr. Durham, Plaintiff referred to Dr. Durham as a back specialist.  (Tr. 55).

During the hearing, Plaintiff testified he is "in pain all the time." (Tr. 50). Plaintiff described that there are times he cannot stand on his left foot due to "gout[7] in [his] knees." (Tr. 50). The ALJ asked Plaintiff if there were other reasons that he was unable to work, and Plaintiff responded that he did not think he could be dependable because some days he "might not be able to get up" because of his pain. (Tr. 50-51). Plaintiff also testified that he takes Ambien for trouble sleeping, but that it no longer helps. (Tr. 51). When asked about his daily activities, Plaintiff testified he normally gets up around five or six in the morning, lets his mother's dog outside, then "just basically just beat around, bump around." (Tr. 52). Plaintiff further testified he eats breakfast around eight-thirty in the morning, but some days he does not eat again until six in the evening due to his loss of appetite. (*Id*.). Plaintiff testified that he stays up at night, but "lay[s] down a lot through the day." (*Id*.). Plaintiff also testified that he will occasionally "get out and communicate," in order to "keep [him] from being stiff all day." (Tr. 53). When asked if he goes shopping, Plaintiff testified that he goes to the grocery store with his mother. (*Id*.). Plaintiff further testified that he used to cook at home with his family, but since he has lived with his mother, he "don't have to cook." (*Id*.). When asked if he does any of the yard work, Plaintiff replied that he cannot cut the entire yard because "it hurts so bad." (*Id*.). Plaintiff testified he does not do chores around the house, except make his bed and keep his room clean; he did minimal chores when he lived with his wife and children, as well. (Tr. 54).

The ALJ asked Plaintiff about his doctors. First, the ALJ asked about Dr. Durham. (Tr. 55). Plaintiff stated that he had seen Dr. Durham three times, and Dr. Durham had taken x-rays and given him "shots in your back." (*Id*.). Plaintiff further testified that Dr. Durham had mentioned surgery, but that he has not been back due to his insurance being canceled at the first

---

[7] The record does not show Plaintiff has been diagnosed with gout; however, Plaintiff testified later in the hearing, "[t]hey said once the arthritis and then they say gout." (Tr. 59).

of the year. (*Id*.).   Next, the ALJ asked Plaintiff's about his pain management doctor,[8] and Plaintiff stated he had seen her approximately ten times, but was not sure if he would be able to see her again due to his insurance cancellation. (Tr. 56).  Plaintiff further testified that the doctor ordered a medication that "eases the pain a whole lot." (*Id*.).  The ALJ then asked Plaintiff if he had seen a kidney specialist.[9] (*Id*.).  Plaintiff stated that he had undergone testing for his kidney, his doctor had changed his medication due to the test results, but he did not know if his kidney problem contributes to his pain. (Tr. 56-57) ("I can't tell if I'm having back pain or it's coming from my kidney.").  Finally, the ALJ asked Plaintiff about a problem with his hand.  Plaintiff stated he has a steel plate in his hand and can move his fingers, but he "can feel it all up in there."  (Tr. 61).

When questioned by his attorney, Plaintiff testified that his neck and left leg cause him the worst pain. (Tr. 58).  Plaintiff stated that he experiences numbness in his left leg and that he uses a cane for support in case he loses his balance. (*Id*.).  Plaintiff further testified that he has problems sitting for longer than fifteen minutes because his leg will go numb, and cannot stand for longer than five or ten minutes because his lower back, knees and hip hurt. (Tr. 59).  Plaintiff stated he could pick up a maximum of five to ten pounds, has problems bending, and would rate his average pain an eight on a scale from one to ten. (Tr. 60).  Plaintiff testified that "probably four, maybe five days out of the week," it takes him a long time to get out of bed. (Tr. 61).

Toward the end of the hearing, the ALJ posed hypothetical questions to a Vocational Expert ("VE") who had reviewed the relevant evidence concerning Plaintiff's past work. (Tr. 62-66).  For the first hypothetical, the ALJ asked the VE if a person with the same age, education

---

[8] The hearing transcript does not reference Plaintiff's pain management doctor by name.  (Tr. 56).  In addition, there are no records in the case file from which to glean any additional information about Plaintiff's visits.

[9] Again, there are no treatment records from a kidney specialist.  It is possible Plaintiff is referring to his primary care physician.

and work experience as Plaintiff, with no physical limitations, could perform Plaintiff's past work, even if they had to be limited to simple, routine, repetitive tasks, and casual interaction with coworkers and the public. (Tr. 63).  The VE stated that a person could perform Plaintiff's past work as laborer, helper, and delivery helper only. (Tr. 64).  In the second hypothetical, the ALJ asked if a person with the same criteria as in the first hypothetical, but limited to work at the light exertional level would be unable to perform the jobs of laborer, helper and delivery helper. (*Id*.).  The VE stated that the person would not be able to do any of those jobs because they were medium to heavy jobs. (*Id*.).  The ALJ then asked whether there would be jobs in the national economy that such a person could work. (*Id*.).  The VE answered in the affirmative and gave examples of light, unskilled jobs, including assembler, cleaner/housekeeper, and hand packer. (*Id*.). In the third hypothetical, the ALJ retained the previous criteria, but added a sit/stand option. (Tr. 64-65).  The VE stated that assembler, machine tender, and wire worker would be appropriate, but that the number of available jobs would be reduced due to the sit/stand option. (Tr. 65).  The ALJ posed a fourth hypothetical, in which he kept the same criteria as the previous hypothetical question, but reduced the exertional level to sedentary. (Tr. 65-66).  The VE testified that jobs as an assembler, grader/sorter, and machine tender would still be available. (Tr. 66). In the final hypothetical, the ALJ posed that the person would have underlying physical conditions requiring them to miss at least two days of work per month.  (Tr.  66). The VE stated that there would still be jobs available; however, it would preclude work if the individual was absent more than two days per month on a consistent basis.  (*Id*.).

Plaintiff's attorney then asked the VE whether work would be precluded if a person had chronic pain to the extent they were off task one-third of an eight-hour day. (*Id*.).  The VE stated

that it would if such a situation was a constant and prevented the person from maintaining the attention, concentration, and pace needed to complete the work. (Tr. 67).

Based on the VE's testimony, Plaintiff's testimony, and the entirety of the record, the ALJ found that based on Plaintiff's age, education, work experience and residual functional capacity, he is capable of adjusting to other work that exists in significant numbers in the national economy; therefore, he is not disabled as defined in the Social Security Act, §§ 216(i) and 223(d). (Tr. 29).

## II.    ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability.  (*Id.*).  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite his impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. (*Id.*). If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, the ALJ determined that although Plaintiff attempted to work after his alleged onset date, he has not engaged in substantial gainful activity since December 31, 2005. (Tr. 22). At the second step, it was determined that Plaintiff has the following severe impairments: borderline intellectual functioning, depression, and chronic cervical pain. (*Id.*). The ALJ further determined that Plaintiff's heart disease, chronic kidney disease, and glucose intolerance were non-severe impairments. (Tr. 22-23).

In the third step, the ALJ found that Plaintiff does not have "an impairment or combination of impairments that meets or medically equals the severity" of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525,

416.920(d), 416.925 and 416.926). (Tr. 23).   Specifically, the ALJ concluded that Plaintiff's spinal problems do not meet the listings because MRI's failed to show "any significant herniations, stenosis, or nerve root impingement." (*Id*.).   In addition, the ALJ found Plaintiff's obesity has had only a minimal impact on his ability to perform work. (*Id*.).

Moving to Plaintiff's mental impairments, the ALJ found that Plaintiff did not meet the listings because the severity of his impairments cause no more than moderate restriction[10] on his activities of daily living, and moderate difficulties in social functioning and maintenance of concentration, pace and persistence. (Tr. 23-24).   Moreover, the ALJ found Plaintiff had no record of having repeated episodes of decompensation for any extended period of time. (Tr. 24). Also, the ALJ held that the medical evidence failed to show Plaintiff would decompensate if changes in his mental demands were made, or that he was unable to function outside a supportive living arrangement in the past, or that he is unable to function independently outside of his home. (*Id*.).   The ALJ stated that Plaintiff's IQ,[11] while low, does not constitute a showing of mental retardation that would satisfy the listing. (Tr. 25).

The ALJ determined Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except he must be allowed to sit or stand at will.  (*Id*.).  Plaintiff is also "limited to simple, routine, repetitive tasks, where he only has casual interaction with coworkers and the public." (*Id*.). In making this determination, the ALJ articulated that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's own statements concerning the "intensity, persistence and limiting effects" of his symptoms were not credible to the extent they were inconsistent with

---

[10] In order to meet the criteria for mental impairments for Listings 12.04 and 12.05, a claimant's restrictions or difficulties must be "marked."  A "marked" limitation means "more than moderate, but less than extreme."

[11] Plaintiff had IQ scores ranging from 72-78, was able to complete most of his classes and work for years.

his RFC. (Tr. 26).  After establishing Plaintiff's RFC, the ALJ determined Plaintiff was unable to perform any past relevant work as a laborer, delivery man, or maintenance worker.  (Tr. 28). However, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id*.).  Specifically, Plaintiff was found to be capable of performing the jobs of unskilled, light occupations such as an assembler, machine tender, or wire worker. (Tr. 29). Therefore, Plaintiff was found to be not disabled under sections 216(i) and 223(d) of the Social Security Act. (*Id*.).

## III.   Plaintiff's Argument for Reversal

Plaintiff makes essentially three arguments.  He contends that the ALJ erred (1) by affording less weight to the opinion of his treating physician, Dr. Howard -- without first recontacting Dr. Howard to clarify his opinion, or obtaining the opinion of a Medical Expert ("ME") -- while giving weight to the Physical Summary by the disability examiner, and (2) that both the physical and mental opinions are not based on substantial evidence.  (Pl's Memo. 5-7, 11).  Plaintiff next urges that the ALJ erred by not specifically addressing every aspect of 20 C.F.R. § 404.1545(c). (Pl's Mem. 11-13).   Finally, Plaintiff argues that because the ALJ discounted his treating physician's opinion, his ability to sit or stand was not addressed in accordance with Social Security Regulations. (Pl's Mem. 7-9).

## IV.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42

U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.   Discussion

### A.   The ALJ Did Not Err in Affording Less Weight to the Opinion of Plaintiff's Treating Physician

Plaintiff initially argues that the ALJ erred in affording less weight to the opinion of his treating physician, Dr. Howard, without first recontacting him to clarify his opinion, or obtaining the opinion of a Medical Expert ("ME"). (Pl's Mem. 6). The court disagrees. The ALJ clearly articulated that he was giving Dr. Howard's opinion very little weight because his opinion was inconsistent with his own treatment records and the results of the consultative examination. (Tr. 27).

Two weeks after Dr. Howard rendered his opinion that Plaintiff was incapable of doing even light, sedentary work, his records show Plaintiff had no focal motor or sensory deficit, his muscles appeared normal, and he had no other abnormalities. (Tr. 440). Physical examinations as far back as October 2008 and January 2009 show Plaintiff was found to be in the normal range. (Tr. 240, 242). In February 2009, when Plaintiff first complained of lower back pain, his physical examination resulted in a normal finding. (Tr. 238). In January 2011, Plaintiff complained of cervical pain, left leg/knee pain, and chest pain, but no longer complained of lower back pain. (Tr. 357). Plaintiff told Dr. Howard that he would no longer be capable of working because of the severity of his pain; but upon physical examination Dr. Howard found no abnormalities with Plaintiff's neck, found no focal motor or sensory deficits, normal appearing muscles, and only medial compartment tenderness in Plaintiff's knee. (Tr. 358). Likewise, physical examinations of Plaintiff from April through July 2011 showed no abnormalities, despite Plaintiff's complaints of neck, back, and leg pain. (Tr. 379-80, 382-83, 385-86, 388-89, 440). In October 2011, Plaintiff again complained of cervical pain and myofascial pain and his physical examination showed tenderness and decreased range of motion in his neck; however, a physical examination in January 2012 was normal. (Tr. 434, 436, 438).

Moreover, other objective medical evidence indicates Dr. Howard's opinion was inconsistent with the record as a whole. For example, a 2010 x-ray of Plaintiff's lumbar spine was normal, and a 2011 MRI showed Plaintiff's left knee had only mild tendonitis. (Tr. 257). In 2011, a left heart catheterization showed only mild atherosclerotic plaquing, and mild peripheral arterial disease. (Tr. 340-41). In addition, Dr. Howard's opinion is inconsistent with the examination performed by Dr. Jani, the consultative examiner. (Tr. 259). The examination showed Plaintiff's neck was supple, he was able to walk on his heels and toes, and did not

require an assistive device. (Tr. 261-62).  Furthermore, there is no record evidence of palpable muscle spasm, tenderness, crepitation, or deformities. (Tr. 262).  Plaintiff's deep tendon reflexes were normal, and his motor strength was 5/5, with good grip strength. (*Id.*).  Quite different from Dr. Howard's assessment, Dr. Jani opined Plaintiff would be capable of lifting and carrying 100 pounds occasionally, and 50 pounds frequently. (Tr. 262).  This court finds there is substantial evidence to support the ALJ's decision to give little weight to Plaintiff's treating physician.

Additionally, Plaintiff argues that little weight was afforded by the ALJ to Plaintiff's mental RFC by his treating physician, as opposed to the weight afforded to the opinions of Drs. Jani and Neville, and that was error.  However, the ALJ's decision does not indicate that he afforded little weight to the opinion of Dr. Howard as opposed to that of Drs. Jani and Neville. The ALJ actually gave great weight to Dr. Jani's indication in his opinion that Plaintiff has "borderline intelligence and might need a 'slow learning' environment." (Tr. 27).  Plaintiff also takes issue with Dr. Jani's assessment as to mental function when he argues that "the opinion . . . was well outside his area of practice." (Pl. Mem. 11).  But Plaintiff, in the next sentence of his brief, relies on the opinion of Dr. Jani to attack the ALJ who states in his opinion that Plaintiff "*might* need a 'slow learning' environment" (*Id.*); (Tr. 27, 262) (emphasis added).  Plaintiff uses Dr. Jani's opinion to assert that he "'needs to be in an adaptive environment for a slow learner'" and that ALJ was wrong to insert the word "might."  (Pl. Mem. 11; Tr. 27, 262).  Thus, it is quite evident that Plaintiff is cherry picking from Dr. Jani's opinion as part of his attack on the ALJ's decision.[12]

---

[12] The ALJ gave great weight to Dr. Neville's opinion in expressing that Plaintiff would be able to function independently and manage his finances, but might need to work in an environment where he would not interact with others. (Tr. 27, 264-66).

Finally, the ALJ examined the records of Dr. Howard relating to his opinions relating to the mental health of Plaintiff and found that Dr. Howard noted that Plaintiff was alert, oriented, cooperative, with stable mood, attentive, doing well despite some fatigue and sleep problems. (Tr. 27,  238, 240, 242, 245, 357, 372, 374, 376, 379, 382, 388, 433, 438, 440).  The ALJ did not afford less weight to Dr. Howard's opinions, but rather found them consistent with Drs. Jani and Neville's opinion.

### B.   The ALJ Did Not Err in Declining to Request a Medical Expert's Opinion

Plaintiff further argues that the ALJ should have requested the opinion of a medical expert before discrediting Dr. Howard's opinion. (Pl's Mem. 7-9). "[T]he ALJ has a basic obligation to develop a full and fair record," *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir.2003); *see also* 20 C.F.R. §§ 416.912(d), 416.927(f)(2), and to provide "sufficient reasoning for determining that the proper legal analysis has been conducted." *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir.1994).  In this case, the court finds that the ALJ did not err by failing to elicit the opinion of a medical expert before discrediting Dr. Howard's opinion.  The ALJ was not required to obtain evidence in the form of an expert medical opinion so long as the ALJ "consider[ed]" the evidence available in some form.

The Eleventh Circuit has made it clear that the opinion of a treating physician is to be given substantial weight unless "good cause" is shown to the contrary.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Thus, it is reversible error if the ALJ fails to clearly articulate good cause for discounting the opinion of the treating physician. (*Id*.).  Good cause is shown when the opinion of the treating physician is not supported by objective medical evidence or is inconsistent with the record as a whole, or inconsistent with the physician's own treatment records.  *See* 20 C.F.R. §§ 404.1527(c)

and 416.927(c)(2); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).   Opinions of non-treating physicians can be given greater weight than treating physicians, so long as there is substantial evidence in the record to support the non-treating physician's opinion.   *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1527(e)(2)(i) and (iii), 416.912(b)(6), 416.927(e)(2)(i) and (iii); SSR 96-6p WL 374180; *Crawford*, 363 F.3d at 1159-60 (11th Cir. 2004); *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. App'x. 869, 872-74 (11th Cir. 2011).

Further, this Circuit has noted "it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984).   The ALJ "has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision." *Castle v. Colvin*, 557 Fed. App'x 849, 853 (11th Cir. 2014) (quoting *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir.2007)).

While the Social Security Regulations allow for clarification, they do not require it. Rather, the decision of whether to recontact a treating physician is solely within the ALJ's discretion. *See* C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (stating the ALJ "*may* recontact [a claimant's] treating physician, psychologist, or other medical source") (emphasis added).   Only in the situation where the record is insufficient for the ALJ to make a determination of disability is the ALJ required to recontact a treating source.   *See* 20 C.F.R. §§ 404.1520b, 416.920b. Specifically, the regulations provide the ALJ with discretion in making a determination as to whether a claimant is disabled despite having inconsistent evidence. As 20 C.F.R. § 404.1520b(b) states, "[i]f any of the evidence in your case record, including any medical

opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have." The regulations do not provide for recontacting a physician unless the evidence of record is "consistent, but insufficient" for the ALJ to determine disability, or if the ALJ weighs the evidence and determines he cannot reach a conclusion. *See* 20 C.F.R. § 404.1520b(c). Neither of those situations arose in this case. The fact that an opinion is inconsistent with other evidence does not mean it is "insufficient" for determining disability. The court finds the ALJ evaluated the evidence, determined Dr. Howard's opinion deserved less weight, and specifically articulated that the evidence in the record (Dr. Howard's opinion) was inconsistent with the other evidence; he never stated that it was insufficient. *See* 20 C.F.R. §§ 404.1527(2)(2), (4), 416.927(2)(2), (4). Accordingly this court finds the evidence to be sufficient for the ALJ to reach an informed determination; therefore, no error exists.

### C.     The ALJ Did Not Err By Not Specifically Addressing Every Aspect of 20 C.F.R. § 404.1545(c)

Plaintiff also asserts that the ALJ was required (but failed) to specifically address Plaintiff's ability to "remember and carry out instructions" pursuant to 20 C.F.R. § 404.1545(c). (Pl. Mem. 12). First, Plaintiff is simply wrong in asserting that the ALJ is required to address every aspect under § 404.1545(c) including "remembering and carrying out instructions." The list is not exhaustive and gives *examples* of mental limitations. Specifically the section states "[a] limited ability to carry out certain mental activities, *such as* limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work." 20 C.F.R. § 404.1545(c) (emphasis added). Notwithstanding Plaintiff's assertion that the ALJ did not address this aspect, the ALJ found in his review of the opinions of Drs. Howard,

Jani, and Neville (and the record as a whole) that Plaintiff "is capable of fine motor function and maintains enough attention to be able to follow a television show, or read, which are within the aforementioned mental capacity to *understand, remember and carry out simple, repetitive instructions*." (Tr. 28) (emphasis added).   Plaintiff's further asserts that the ALJ failed to "address [Plaintiff's] ability to respond to work pressures in limiting his analysis to ability to interact in the work place." (Pl. Mem. 13).   To be clear, there is no requirement that the ALJ refer specifically to each and every item of evidence in the record, so long as the determination is not a broad rejection. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (citing *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).   In other words, an ALJ does not err when she fails to specifically refer to each pain scale, test result, or subjective complaint contained in the record.   Here the ALJ reviewed the entire record, including Dr. Neville's opinion, which states that Plaintiff's "ability to respond appropriately to coworkers was considered mildly impaired. His ability to cope with ordinary *work pressures* appeared moderately impaired.   He seems willing to accept supervision." (Tr. 266) (emphasis added).   The ALJ did not make a broad rejection in this case; rather, he specifically stated that he gave this opinion "great weight, as it is an objective assessment of [Plaintiff's] mental abilities, which is consistent with the record." (Tr. 27).

D.     **The ALJ Did Not Err When He Did Not Request the Opinion of a Medical Expert as Part of the Determination of the Sit/Stand Option for Plaintiff's RFC**

Plaintiff also argues that, after the ALJ discredited Dr. Howard's opinion, the ALJ erred by not requesting the opinion of a medical expert regarding his ability to sit/stand before determining his RFC.   Plaintiff contends that in this case it would have been particularly important to obtain clarification on the amount of time he could sit and be on his feet because in

discounting Dr. Howard's opinion on the issue, the ALJ failed to properly address the issue. Specifically, Plaintiff contends that a finding of a sit/stand option at will is non-compliant with SSR 83–12 and SSR 96–8 which requires specificity in each function, especially where sitting and standing must be alternated.  The court concludes this argument is off the mark.

First, the final responsibility for determining a claimant's RFC lies with the ALJ, "based upon consideration of all relevant evidence [] in the record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he [] is able or unable to do, and many other factors" that could help determine the most reasonable findings in light of all the evidence. SSR 96–5p, 20 C.F.R. § 416.945.  A medical source's statement about what an individual can still do is a medical opinion.  Medical sources often offer opinions about whether an individual who has applied for disability benefits is "disabled" or "unable to work," or make similar statements of opinions. *See Robinson v. Astrue*, 365 F.App'x 993, 999 (11th Cir. 2010) ("task of determining a claimant's [RFC] and ability to work is within the province of the ALJ, not of doctors").  A medical source opinion is not entitled to controlling weight or given special significance.  Because determination of a claimant's RFC is an administrative finding, that determination is reserved to the Commissioner.  *See Shaw v. Astrue*, 392 F.App'x 684, 687 (11th Cir. 2010).

Neither the Eleventh Circuit nor the Social Security Regulations require the ALJ to provide a detailed written analysis of each impairment and the effect on the claimant's ability to perform each and every work-related function such as sitting, standing, walking, lifting, carrying, pushing, and pulling. *See Carson v. Comm'r of Soc. Sec.*, 440 Fed. Appx. 863 (11th Cir.2011) (holding that, although the ALJ "did not specifically refer to [the claimant's] ability to walk or

24

stand," the ALJ's opinion was nevertheless sufficient to allow the court to determine that the ALJ "did fully consider [the claimant's] limitations with regard to walking and standing"); *Baker v. Comm'r of Soc. Sec.*, 384 Fed.Appx. 893, 895-96 (11th Cir. 2010) (holding that, although the ALJ did not perform a function-by-function analysis on the effect of the claimant's cane on "specific basic sedentary work skills" such as "balancing, prolonged versus brief ambulation, standing, lifting and carrying with one hand, balancing on level terrain, and stooping," the ALJ's finding that the claimant was "able to walk effectively with" the cane was sufficient to support the RFC assessment).

Based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96–4p, 96–7p, as well as opinion evidence in accordance with 20 C.F.R. §§ 404.1527 and 416.927, and SSRs 96–2p, 96–5p, 96–6p, and 06–3p, the court finds that the ALJ considered all of Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, and, after doing so, correctly determined Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with these exceptions: he must be allowed to sit or stand at will; limited to simple, routine, repetitive tasks; and only have casual interaction with co-workers and the public.

## VI.     Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination.  The Commissioner's final decision is therefore due to be affirmed.  A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this March 27, 2015.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE